IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 23, 2015

**BRICE C. WHALEY, JR. v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hamblen County**
**No. 12CR849      John F. Dugger, Jr., Judge**

———————————

**No. E2014-01636-CCA-R3-PC – Filed August 20, 2015**

———————————

The petitioner, Brice C. Whaley, Jr., appeals the denial of his petition for post-conviction relief from his best interest guilty plea convictions for criminal responsibility for especially aggravated kidnapping and abuse of a corpse. He argues that he received ineffective assistance of counsel. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee (on appeal); and Bradley R. Jones, Morristown, Tennessee (at hearing), for the appellant, Brice C. Whaley, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; C. Berkeley Bell, District Attorney General; and Kimberly Morrison, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was indicted for first degree murder, especially aggravated kidnapping, and abuse of a corpse. On March 22, 2012, he entered best interest guilty pleas to criminal responsibility for especially aggravated kidnapping, a Class A felony, and abuse of a corpse, a Class E felony. Pursuant to the terms of his negotiated plea agreement, he was sentenced as a violent offender to an effective term of seventeen years and six months at 100%, and the first degree murder charge was dismissed.

According to the petitioner's statements, which were admitted as exhibits at the guilty plea hearing, the petitioner allowed his three accomplices, Darrell Nance, Jessica Lane, and Anthony Patton, to borrow his vehicle after overhearing Mr. Nance threaten to shoot and stab Donnie Johnson, who had been accused of stealing $3000 from Ms. Lane. Mr. Nance said if he could not get Mr. Johnson, then he would get Mr. Johnson's grandfather, the elderly victim, and make Mr. Johnson "pay that way." The petitioner's accomplices left and when they returned about two hours later, Mr. Nance told Ms. Lane to call Mr. Johnson and tell him he had two hours to contact him about the stolen money or his grandfather "would be done." The petitioner then drove his accomplices to several locations, ending at the home of Mr. Nance's mother. Mr. Nance told the petitioner "to go to Betty's trailer" and dispose of the victim's body. At the trailer, the petitioner found the deceased victim sitting in a chair tied up with cords. The petitioner untied the victim, put his body in the back of his vehicle, and "dumped [the victim's body] out" at an industrial park. The petitioner severed the victim's hand because Mr. Nance "wanted a hand for a trophy or souvenir." The police subsequently found the victim's hand and a knife in the petitioner's vehicle.

The petitioner filed a *pro se* petition for post-conviction relief on December 19, 2012, and, following the appointment of counsel, an amended petition was filed on July 31, 2013. In his petitions, the petitioner alleged that he received the ineffective assistance of trial counsel and that his guilty pleas were involuntarily and unknowingly entered. He further alleged that he was innocent of the charges and lacked the mental capacity to enter a plea.

At the July 2, 2014 evidentiary hearing, the petitioner testified that trial counsel was appointed to represent him at the preliminary hearing, his arraignment, and in criminal court. The petitioner said that after his original indictment was returned in January 2009, he was out on bond for about ten months, during which time trial counsel spoke to him twice regarding delays in receiving discovery. Subsequently, in September 2009, the grand jury returned a three-count supersedeas indictment against the petitioner, and his bond was increased from $50,000 to $300,000. Unable to make the new bond, the petitioner was taken into custody. He said he was incarcerated for almost a year before trial counsel came to see him. Trial counsel reviewed the discovery with him, and they discussed an insanity defense. The petitioner tried to bring up the issue of an alibi defense with trial counsel, but counsel told him he should take the plea offer. He told trial counsel about potential alibi witnesses but did not know if counsel ever spoke to those witnesses. The petitioner said he felt pressured by trial counsel to take the plea offer and did not feel that counsel was adequately prepared to defend him if he went to trial. The petitioner said that, over the course of the entire criminal proceeding, he met with trial counsel six or seven times, with each meeting lasting an average of forty-five minutes.

The petitioner said that at the November 1, 2011 hearing to address the delay in the mental evaluation of the petitioner, which had caused the trial to be postponed, he told the trial court that he was "[v]ery" concerned about trial counsel's representation because he and counsel "hadn't talked about a defense and it was coming up on court and [he] hadn't heard from [counsel]." Although the trial court offered to appoint new counsel for the petitioner, the petitioner chose to remain with trial counsel because "[counsel] said he would do the best that he could for [the petitioner]. That [the petitioner] would be number one on his list." However, the petitioner did not feel that trial counsel had done so. The petitioner said that he eventually underwent a mental evaluation in early 2012.

The petitioner identified two letters, dated September 27, 2011, and January 27, 2012, that he wrote to the trial court asking for help because trial counsel kept "trying to get [the petitioner] to take the DA's offer," which the petitioner refused to do. In the January 27, 2012 letter, the petitioner asked the trial court to "fire" trial counsel because he knew "without a doubt that [counsel would] not defend [him] even a little bit." However, the petitioner acknowledged that, at his plea hearing two months later, he told the trial court that he was satisfied with trial counsel but said he did so because, based upon trial counsel's representation up until that point, he was "scared to death" he would receive a life sentence if he went to trial.

The petitioner acknowledged that the Veterans' Administration ("VA") had assessed him with an 80% disability impairment rating based on his post-traumatic stress disorder ("PTSD") and frontal lobe damage to his brain as a result of his military combat service. He said no expert ever had a chance to testify on his behalf as to his disability.

On cross-examination, the petitioner admitted that he and trial counsel did discuss possible defenses, but they were not viable. He agreed that the State's plea offers were initially life without parole, then twenty-five years, and ultimately seventeen and one-half years at 100%. He said that trial counsel discussed the result of his mental evaluation, which was inconclusive, and told him that it would not be helpful at trial. The petitioner acknowledged that trial counsel explained the charges and waiver of rights to appeal to him and that he read and understood the guilty plea form. He admitted that, during the plea hearing, he told the trial court that he was satisfied with trial counsel's representation and had no complaints about counsel.

Trial counsel testified that he had been a practicing attorney since 1979 and had handled fifteen to twenty murder cases during that time. He first met the petitioner in January 2008 when he was charged with abuse of a corpse and accessory after the fact at the general sessions level. The petitioner was indicted some months later, and counsel

3

was reappointed to represent him. Trial counsel said that he met with the petitioner "far more" than six or seven times. They discussed that the State was not alleging the petitioner was present when the victim was kidnapped or killed, and counsel explained the meaning of criminal responsibility to the petitioner. The petitioner had "difficulty understanding that a person could be convicted of a crime and be somewhere else while the actual crime was committed." They also discussed possible defenses, including an alibi defense, and the fact that alibi was not the issue.

As to the plea offers, trial counsel said that it would have been "foolish" for the petitioner to accept the first offer of life without parole. He also advised the petitioner not to accept the twenty-five-year offer because he thought a better offer would be forthcoming. Counsel said he would have sought a better offer than the seventeen and one-half years, but the victim's family would not agree to a lesser sentence.

Trial counsel said that the petitioner's primary care doctor had moved away from Johnson City, but he ultimately located the doctor at the VA in Asheville, North Carolina. He talked to the physician and asked him to come to court and testify about the petitioner's history, diagnoses, and treatment, but the physician declined to do so, saying he would not be an effective witness for the petitioner. Trial counsel said that the petitioner underwent a mental evaluation through the State of Tennessee, but that evaluation was "[n]ot at all" helpful to their defense because it showed that the petitioner was "likely malingering . . . or exaggerating [his] symptoms." Trial counsel spoke with several doctors trying to find one that had experience with PTSD who would make an effective representation in court and ultimately chose Dr. James Walker who evaluated the petitioner. The results of Dr. Walker's evaluation indicated "malingering, exaggeration of symptoms and exaggeration of claims . . . that would not bolster [the petitioner's] credibility." Trial counsel said that neither of the petitioner's mental evaluations offered any support to the defense.

Trial counsel said that, shortly before the petitioner entered his pleas, the petitioner's father contacted his own attorney and asked him to review the petitioner's case. Trial counsel took the discovery books to the attorney's office and, after reviewing the discovery, the attorney told trial counsel that "he didn't think that [the petitioner] would want to go to trial with these pieces of evidence against him, and that he was going to talk again with [the petitioner's] father." Trial counsel continued to seek a lower plea offer, but when the victim's family refused to agree to a sentence less than seventeen and one-half years, the petitioner asked to speak to his wife. Trial counsel then met with the petitioner and his wife and also allowed the two of them to discuss the case alone. Trial counsel believed the petitioner was influenced by his wife in taking the plea offer.

4

On cross-examination, trial counsel said that he contacted one potential alibi witness, but the witness did not want to get involved. Asked to expand upon the petitioner's difficulty in understanding the theory of criminal responsibility, trial counsel replied:

> [The petitioner] kept wanting to come back and say how can they convict me, I wasn't there. And so we would have the discussion again that you don't have to be there if you did something in active participation of helping the crime along. And so I took that to mean that he was not getting it, the fact that . . . his physical presence was not required in order for a conviction to be obtained."

Trial counsel said he was prepared to go to trial if the petitioner had not accepted the plea agreement and had witnesses who would have testified on the petitioner's behalf as to his version of the events and the injuries he suffered while in the military.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and subsequently entered a written memorandum opinion and order on July 29, 2014, dismissing the petition.

## ANALYSIS

On appeal, the petitioner argues that the post-conviction court erred in finding that he received the effective assistance of trial counsel. The State counters that the post-conviction court properly denied the petition because the petitioner failed to demonstrate that he received ineffective assistance of trial counsel and that the alleged deficiency affected the voluntariness of his pleas.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984). The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he or she would not have pled guilty but would instead have insisted on proceeding to trial. Hill v. Lockhart, 474 U.S. 52, 59 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001).

Before a guilty plea may be accepted, there must be an affirmative showing in the trial court that it was voluntarily and knowingly entered. Boykin v. Alabama, 395 U.S. 238, 242 (1969); State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977). This requires a showing that the defendant was made aware of the significant consequences of the plea. State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999) (citing Mackey, 553 S.W.2d at 340). A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he or she fully understands the plea and its consequences. Pettus, 986 S.W.2d at 542; Blankenship, 858 S.W.2d at 904.

Because the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. Blankenship, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) the defendant's familiarity with criminal proceedings; (3) whether the defendant was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against the defendant and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. Id. at 904-05.

In its written opinion and order, the post-conviction court determined:

The Court finds that [trial counsel] is a very experienced criminal defense attorney with more than thirty years experience and has represented

6

defendants in approximately fifteen to twenty murder cases. [Trial counsel] and Petitioner had a very volatile attorney/client relationship. The Court was prepared to relieve [trial counsel] as petitioner's attorney when he was not prepared for trial. Petitioner told the court that he wanted to keep [trial counsel] as his counsel. Petitioner testified under oath during his best interest plea . . . to the following:

> THE COURT:  Now, are you satisfied with [trial counsel]?
>
> THE [PETITIONER]:  Yes, Sir.
>
> THE COURT:  Now, you and [trial counsel] have had some turbulent times in the last few years in representation, but have you all settled all your differences and you're totally satisfied with the hard work he's been doing for you?
>
> THE [PETITIONER]:  Yes, Sir.
>
> THE COURT:  Any complaint at all?
>
> THE [PETITIONER]:  No, Sir.
>
> THE COURT:  You're not going to come back and say something that happened two years ago you're not happy with that – but you're satisfied with his representation and hard work in this case[?]
>
> THE [PETITIONER]:  Yes, Sir.
>
> THE COURT:  Did he do everything you wanted him to do in connection with this case today?
>
> THE [PETITIONER]:  Yes, Sir.
>
> THE COURT:  Is there something he did you didn't want him to do?
>
> THE [PETITIONER]:  No, Sir.

This Court finds that petitioner is not credible because his testimony during his best interest plea is contra to his testimony during the post

conviction hearing. A review of Exhibit 1 (original case file) reflects that [trial counsel] filed the appropriate motions which totaled twenty-seven (27). The record clearly shows that [trial counsel] explained the elements of the offenses, theory of liability of criminal responsibility for conduct of another and explained his constitutional rights to him in the waiver of rights and plea of guilty forms.

The Court finds [trial counsel] was faced with an extremely difficult case. The Petitioner's credibility could have easily been attacked for the reasons previously set forth in this opinion. [Trial counsel] counseled with Petitioner, investigated the case and tried to exclude the prejudicial evidence against Petitioner. [Trial counsel] obtained the best plea agreement that he could get for Petitioner. Under the guidelines of Baxter v. Rose, 523 S.W.2d 93[0] (Tenn. 1975) [and] Strickland v. Washington, 466 U.S. 668 (1984), the Court finds that Petitioner received effective assistance of counsel by his attorney[.]

The petitioner has failed to prove that counsel was ineffective or that his guilty pleas were not knowingly and voluntarily entered. The record shows that trial counsel and the petitioner discussed the State's offer, as well as the facts of the case, what the State would have to prove for the petitioner to be found guilty of criminal responsibility for especially aggravated kidnapping and abuse of a corpse, the range of punishment, and his rights. At the plea submission hearing, the petitioner verified under oath that he had discussed the plea agreement with counsel and that he was entering his pleas freely and voluntarily. He affirmed to the court that he was satisfied with trial counsel's representation and that he had not been forced or pressured into entering the pleas. Accordingly, we conclude that the record supports the determination of the post-conviction court.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
ALAN E. GLENN, JUDGE

8